NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

25-P-928                                        Appeals Court

          SKECHERS USA, INC. <u>vs</u>.  COMMISSIONER OF REVENUE.

                         No. 25-P-928.

          Suffolk.     April 8, 2026. - July 30, 2026.

             Present:  Massing, Ditkoff, & Hand, JJ.


     <u>Taxation</u>, Corporate excise, Manufacturing corporation.


     <u>Appeal</u> from a decision of the Appellate Tax Board.


     <u>Michael J. Bowen</u> for the taxpayer.
     <u>Celine E. de la Foscade-Condon</u> (<u>Brett M. Goldberg</u> also
present) for Commissioner of Revenue.


     MASSING, J.  In this appeal, we consider whether the

taxpayer, Skechers USA, Inc. (Skechers), qualifies as a

"manufacturing corporation" for purposes of the corporate excise

tax.  See G. L. c. 63, § 38 (<u>l</u>) (1), as amended through

St. 2013, c. 46, §§ 36, 37.  Skechers contends that its business

is to design and market footwear, but that it plays only an

"incidental" role in the actual production of its shoes.  The

Appellate Tax Board (board) determined that Skechers was engaged

in manufacturing in substantial part and, on that basis, affirmed the Commissioner of Revenue's (commissioner) denial of Skechers's application for abatement of corporate excise taxes. In its appeal from the board's decision, Skechers argues that the board erred and that, as a design and marketing company, not a manufacturer, it was entitled to use a more favorable formula for determining its tax liability. We affirm.

1. Background. Skechers is a Delaware corporation with its principal place of business in Manhattan Beach, California. It is an international footwear retailer and wholesaler that sells a variety of adult and children's "lifestyle" footwear, as well as functional work shoes, running shoes, and golf shoes, with retail locations throughout the United States, including Massachusetts. During the tax years at issue, 2015 through 2017, Skechers maintained two offices in China and one in Vietnam that functioned as liaisons between its California-based design team and approximately ten independent factories located in China and Vietnam.

For each tax year at issue, Skechers filed its Massachusetts corporate excise tax returns using the three-factor apportionment formula, based on property, payroll, and sales, applicable to most general business corporations. As the board explained in its thoughtful and comprehensive findings of fact and report, manufacturing corporations with income from

business activity that was taxable both within and outside Massachusetts were required to apportion their income using a single-factor formula based solely on sales. For manufacturers with little property or payroll in Massachusetts, like Skechers, the use of the single-factor formula tended to increase the proportion of their income apportioned to the Commonwealth, increasing their tax liability. Thus, it was advantageous for Skechers not to be considered a manufacturer.

In October 2020, following an audit, the commissioner issued an adjustment taxing Skechers as a manufacturing corporation using the single-factor apportionment formula. The commissioner issued a notice of intent to assess in November 2020, followed by a notice of assessment in December 2020. The assessment reflected a tax liability of $155,043, an underpayment penalty of $31,009, and interest of $36,476.98 for the three years at issue. Skechers filed for an abatement in April 2021.

After a hearing, the commissioner denied abatement of the assessed tax and interest but abated the penalty. Skechers paid the assessment and appealed to the board. After an evidentiary hearing in October 2023, the board issued a decision in May 2024 in favor of the commissioner. In May 2025, the board issued its findings of fact and report concluding that Skechers was engaged in manufacturing in substantial part. This appeal followed.

2.  Definition of "manufacturing corporation."  Before we set forth the board's factual findings regarding Skechers's participation in the process of producing Skechers brand footwear, we summarize the commissioner's and the board's considerations for determining whether an entity is a "manufacturing corporation" for tax purposes.

During the tax years at issue, the corporate excise tax statute, G. L. c. 63, § 38, defined a "manufacturing corporation" as one "engaged, in substantial part, in transforming raw or finished physical materials by hand or machinery, and through human skill and knowledge, into a new product possessing a new name, nature and adapted to a new use." G. L. c. 63, § 38 (l) (1), as amended through St. 2013, c. 46, §§ 36, 37.[1]  This definition contains two related requirements:

---

[1] Throughout our decision, we cite to the version of the statute and regulations in effect during the relevant tax years. Although the statute was amended in 2017 and again in 2018, those amendments affected other parts of the statute not relevant here.  See St. 2017, c. 55, §§ 8, 9.  See also St. 2018, c. 273, § 17, 18.  Effective January 1, 2025, the Legislature eliminated the distinction between manufacturing and nonmanufacturing corporations for purposes of the excise tax under G. L. c. 63, § 38.  All business corporations are now taxed using the single-factor formula.  See St. 2023, c. 50, § 31 (striking G. L. c. 63, § 38, in its entirety and inserting new language in place thereof).  The same definition of a "manufacturing corporation," however, was inserted in G. L. c. 63, § 42B (e).  See St. 2023, c. 50, § 35.  Status as a manufacturing corporation, as defined under § 42B (e), remains relevant for purposes of the use tax exemption, G. L. c. 64H, § 6 (r), (s); G. L. c. 64I, § 7 (b), as well as the investment tax credit, G. L. c. 63, § 31A, and the local property tax

that the corporation "be engaged in manufacturing," and that it do so "in substantial part" (citation omitted). Genentech, Inc. v. Commissioner of Revenue, 476 Mass. 258, 264 (2017). See 830 Code Mass. Regs. § 58.2.1(6) (1999) (setting forth and illustrating factors for classification as manufacturing corporation).

"Manufacturing normally involves a change of some substance, element, or material into something new or different." Charles River Breeding Lab., Inc. v. State Tax Comm'n, 374 Mass. 333, 335 (1978). The inquiry focuses on whether the corporation's activities contribute to the transformation of materials into a product "of substantially different character" (citation omitted). Genentech, Inc., 476 Mass. at 262. "A process which does not produce a finished product, but constitutes an essential and integral part of a total manufacturing process, may constitute manufacturing." 830 Code Mass. Regs. § 58.2.1(6)(b)(7).

---

exemption, G. L. c. 59, § 5, Sixteenth (3). See Genentech, Inc. v. Commissioner of Revenue, 476 Mass. 258, 262 n.6 (2017); Onex Communications Corp. v. Commissioner of Revenue, 457 Mass. 419, 422-424 (2010); Commissioner of Revenue v. Houghton Mifflin Co., 423 Mass. 42, 44 & nn.3-4 (1996). "[O]ur cases have considered the term 'manufacturing corporation' to have the same meaning in the property tax exemption statute as it does in the corporate excise tax statute." Genentech, Inc., supra.

In addition, "our cases have required that the degree of manufacturing must be 'substantial' . . . when measured against the entire operations of the corporation." Fernandes Super Mkts., Inc. v. State Tax Comm'n, 371 Mass. 318, 322 (1976). A corporation may engage in both manufacturing and nonmanufacturing activities; however, where the manufacturing component constitutes "an important and material branch of the business" in relation to the corporation's overall operations, it is properly classified as a manufacturing corporation. Assessors of Boston v. Commissioner of Corps. & Taxation, 323 Mass. 730, 746 (1949). The substantiality inquiry considers the role of manufacturing within the corporation's business as a whole, including its contribution to revenue, the allocation of the corporation's assets to manufacturing, and its relationship to the corporation's overall activities. See Commissioner of Corps. & Taxation v. Assessors of Boston, 321 Mass. 90, 97 (1947).

During the tax years at issue, the corporate excise tax statute provided that a corporation's manufacturing activities would be considered substantial if they met any one of five alternative tests, four of which measured the percentage of sales, payroll, or tangible property attributed to or used in the manufacturing process. See G. L. c. 63, § 38 (l) (1). For example, manufacturing activities are deemed substantial if at

least twenty-five percent of the corporation's gross receipts are derived from the sale of manufactured goods. See id. The fifth test was whether "the corporation's manufacturing activities are deemed substantial under relevant regulations promulgated by the commissioner." Id. See Genentech, Inc., 476 Mass. at 264.

3. Skechers's manufacturing process. We summarize how Skechers shoes are made as set forth in the board's findings of fact, supplemented by uncontested facts from the record. See G. L. c. 58A, § 13 ("The decision of the board shall be final as to findings of fact"). The board delineated the following steps in the process, from start to finish:

Product development brief. Skechers begins the shoemaking process by creating a "product development brief." For each of the two primary seasons -- the fall and winter season and the spring and summer season -- or in response to market trends, Skechers designers and merchandisers outline the concept, inspiration, or direction of a product and present it at a meeting attended by designers, merchandisers, and product technicians. The brief is for internal use and is not shared with Skechers's third-party manufacturers.

Design specifications. Skechers designers then prepare design specifications. These specifications set forth detailed information concerning nearly all aspects of the proposed shoe,

including materials, stitching, color, dimensions, and technological elements.  The specifications may identify a particular "last" or "mold" to be used -- the last determines the overall shape and fit of the shoe, and the mold is used for the bottom of the shoe -- or may direct the third-party manufacturer to create a new last or mold in accordance with Skechers's measurements and guidelines.  The specifications may also identify the construction method and the stitch pattern.

<u>Manufacturer selection, materials, and testing</u>.  The specifications are transmitted to Skechers's Asia offices, where employees choose factories and work with them to refine the specifications based on factory feedback.  Skechers maintains ongoing relationships with many overseas factories.  Although the factories are typically responsible for procuring raw materials and negotiating prices with suppliers, their choices must comply with Skechers's specifications and testing requirements, and Skechers may require the use of particular suppliers.

Factories prepare "spec sheets" specifying materials to be used in each part of the shoe, which Skechers personnel review and may modify if they are not satisfied with the selected materials.  A factory's failure to comply may result in monetary penalties or refusal of the product.  Skechers either conducts testing or reviews the factories' testing of materials to ensure

that the selected materials meet industry, and its own, standards.

Prototypes and line review. The third-party factories next produce a "pullover," a physical prototype derived from Skechers's designs, for Skechers to assess pattern and fit. Skechers designers and product technicians, both overseas and in the United States, conduct the "initial line review" of the pullover and may mark revisions directly on it. Skechers's United States designers and technicians may travel to Asia to convey revisions in person. Skechers may discontinue a product at this stage.

If the product proceeds, lasts and molds are produced at Skechers's request and in accordance with its specifications. The third-party factories generally contract with other factories to produce the lasts and molds, but the specifications are dictated by Skechers, which employs technicians to work with these manufacturers. Factories may not destroy or recycle lasts or molds without Skechers's approval.

At the "middle line review," sample shoes are produced in two color patterns, which Skechers's United States employees review and, if necessary, make further revisions. At the "final line review," the product is produced in all colors, and Skechers employees conduct quality assurance.

Fit testing and confirmation. Product review and fit testing take place throughout development. If problems are identified, Skechers product technicians are notified and direct the factories to make necessary changes. Factories provide revised samples until the product meets Skechers's requirements. Once fit and construction are approved, factories produce a confirmation sample. The development process typically takes six to nine months.

Preproduction and initial production. Before mass production, Skechers commercialization and development teams meet with the factories to address final design alterations and any other outstanding issues. At this stage, factories make "dies" -- specialized tools for cutting and shaping materials -- for every size of shoe and produce a few sample pairs in each size. Skechers employees are present to review the samples. Following approval, Skechers and the factory finalize standard operating procedures and proceed to preproduction.

The third-party factories then conduct initial production runs. Skechers personnel confirm that each size is produced in accordance with the specifications and standard operating procedures and conduct quality checks. If these are satisfactory to Skechers, the factories may go forward with production. Skechers quality assurance personnel also perform visual inspections of equipment and verify that machinery

operates within required specifications. If deficiencies are identified, Skechers directs corrective action, and production does not proceed until the issues are resolved. Skechers's overseas personnel remain present at the factories, and samples are sent to Skechers employees in the United States for inspection.

Final inspection and distribution. After production, Skechers conducts a final inspection. Reports identify passing and defective products, and factories must remove defective units if failure rates exceed specified thresholds. Products are then packaged according to Skechers's instructions in boxes designed by Skechers employees and shipped to distribution centers.

4. Review of board's decision. a. Standard of review. "We will not reverse a decision of the [Appellate Tax Board] if it is based on substantial evidence and on a correct application of the law." Welch v. Commissioner of Revenue, 105 Mass. App. Ct. 391, 395 (2025), quoting U.S. Auto Parts Network, Inc. v. Commissioner of Revenue, 491 Mass. 122, 128 (2022). "We review conclusions of law, including questions of statutory construction, de novo." New England Forestry Found., Inc. v. Assessors of Hawley, 468 Mass. 138, 149 (2014). Although the board's findings of fact are final, "the court may consider whether the evidence in the case is sufficient to support the

board's conclusion of law." Kennametal, Inc. v. Commissioner of Revenue, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). "[B]ecause the board is an agency charged with administering the tax law and has expertise in tax matters, we give weight to its interpretation of tax statutes, and will affirm its statutory interpretation if that interpretation is reasonable" (quotation and citations omitted). AA Transp. Co. v. Commissioner of Revenue, 454 Mass. 114, 119 (2009).

b. Skechers's engagement in manufacturing. The first inquiry in assessing whether a taxpayer is to be treated as a "manufacturing corporation" is whether the corporation is engaged in manufacturing, that is, "in transforming raw or finished physical materials by hand or machinery, and through human skill and knowledge, into a new product possessing a new name, nature and adapted to a new use." G. L. c. 63, § 38 (l) (1). Skechers contends that its activities do not amount to manufacturing.

"The words 'engaged in manufacturing' are not to be given a narrow or restrictive meaning." Genentech, Inc., 476 Mass. at 263, quoting Assessors of Boston, 323 Mass. at 748-749. Consistent with this approach, a wide range of activities that affect or contribute to the transformation of source materials into a different product have been held to constitute manufacturing. See, e.g., Genentech, Inc., supra at 259, 263

(corporation's drug production activities, in which scientists implant deoxyribonucleic acid molecules into living cells to modify cells' genetic code for purpose of producing and extracting "proteins of interest"); William F. Sullivan & Co. v. Commissioner of Revenue, 413 Mass. 576, 577-578 (1992) (separation and dismantling of scrap metal into different sizes and metallurgical content to meet industry specifications for use by steel mills and foundries); Assessors of Boston, supra at 741-742 (transformation of "raw green coffee beans" into "roasted and ground coffee ready for immediate use as beverage," notwithstanding that both raw material and finished product share same name); Noreast Fresh, Inc. v. Commissioner of Revenue, 50 Mass. App. Ct. 352, 353-354 (2000) (processing of raw vegetables, grown by others, into variety of prepackaged products for sale to supermarket chains). Indeed, "a company may be engaged in manufacturing where the company produces no final product itself, but generates blueprints or plans that are sent to third parties for ultimate production." Onex Communications Corp. v. Commissioner of Revenue, 457 Mass. 419, 427 (2010). See id. at 421 (development of "computer-edited design that included technical specifications of the hardware and software components" and prototypes of two computer chips to be produced by third party for use in telecommunications). The source materials can be intangible as well as tangible. See

Commissioner of Revenue v. Houghton Mifflin Co., 423 Mass. 42, 48 (1996) (transformation of "ideas, art, information, and photographs, by application of human knowledge, intelligence, and skill, into computer disks" to be used by third-party suppliers to print books or to package as compact discs).

To qualify as manufacturing, the taxpayer's activities must play an "essential and integral" part in the total manufacturing process, even if those activities do not produce a finished product for the consumer. Joseph T. Rossi Corp. v. State Tax Comm'n, 369 Mass. 178, 181 (1975). This test has been phrased as whether the taxpayer's contribution "is a sine qua non of the produced items' ultimate salability." Associated Testing Lab., Inc. v. Commissioner of Revenue, 429 Mass. 628, 631 (1999). The "sine qua non" formulation may be overinclusive, however, because any creative process, such as writing a book or designing furniture, could be called the sine qua non of the production of the finished product. See Houghton Mifflin Co., 423 Mass. at 49. See also William F. Sullivan & Co., 413 Mass. at 581 ("not . . . every process comprising the first step, or a step, in the transformation of some source material into a finished product qualifies as a process which is an essential and integral part of the total manufacturing process as that phrase has been used in our cases").

Applying these principles, the record amply supports the board's conclusion that Skechers is engaged in manufacturing. Skechers's activities extend far beyond the creation of concepts or designs. Skechers designers prepare specifications that set forth the parameters of nearly all aspects of the proposed product, including materials, dimensions, stitching, colors, and technological features. Its involvement continues beyond prototyping into the preproduction process, in which Skechers designers and product technicians review and revise prototype pullovers, marking changes directly on the pullover and requiring further refinements. Skechers reviews and revises molds and requires that lasts conform to its specifications. Skechers's requirements govern the third-party manufacturers' selection of materials used in production. Although factories may independently purchase raw materials, they must comply with those requirements, and Skechers may require the use of specific suppliers. Skechers conducts or reviews testing to ensure that materials meet required performance standards.

Skechers's role continues through production. Before full production begins, factories conduct test runs and prepare standard operating procedures, which are submitted to Skechers for review and approval. During production, Skechers employees present at factories confirm that products are manufactured in accordance with specifications and perform inspections,

including verification that machinery operates within required parameters. Skechers conducts final inspections and designs the packaging for final sales.

As the board aptly found, the evidence "showed a near-continuous back and forth between Skechers'[s] US employees, its overseas employees, and the factories -- including e-mail communications and in-person visits -- throughout the entire shoe-creation process," and that Skechers employees played a "vital role . . . throughout the entirety of the shoe creation process."[2] Skechers's involvement in the manufacture of Skechers brand footwear by third-party factories is comparable to that of Houghton Mifflin in the development of content to be produced by third parties as printed books or compact discs, see Houghton Mifflin Co., 423 Mass. at 48, 50-51; more extensive than Onex Communications' design and development of prototype computer chips, see Onex Communications Corp., 457 Mass. at 421, 430-432; and more transformative than the scrap metal repurposing

---

[2] Skechers claims in its brief that the board erred in finding that it "controlled every detail of how the footwear was manufactured." Although the board's factual findings are final, its decision "may be challenged on the ground that it is not supported by 'substantial evidence.'" Schussel v. Commissioner of Revenue, 472 Mass. 83, 86 (2015). The board did not, however, make the finding that Skechers attributes to it. The record amply supports the finding that the board did make concerning the essential roles that Skechers employees played throughout the manufacturing process.

conducted in William F. Sullivan & Co., 413 Mass. at 577-578, or the produce packaging in Noreast Fresh, Inc., 50 Mass. App. Ct. at 353-354.

Skechers's arguments to the contrary are unavailing.  For example, Skechers contends that all its activities that culminate in the production of a prototype should be "excluded from consideration."  In support of this assertion, Skechers points to one-half of one of the guiding principles in the commissioner's regulations for determining whether a process constitutes manufacturing:  "Market research, research and development, and design and creation of a prototype, although prerequisites to manufacturing, are not manufacturing."  830 Code Mass. Regs. § 58.2.1(6)(b)(5).  Although the commissioner and the board might not have considered Skechers a manufacturer if it did nothing more than produce prototypes for third parties, that characterization is contrary to the uncontested evidence that Skechers had significant additional involvement in the manufacturing process.  See Onex Communications Corp., 457 Mass. at 429.  Moreover, Skechers overlooks the other half of the same subsection -- the sentence that precedes the sentence on which Skechers relies -- which better describes Skechers's activities:  "Manufacturing ordinarily involves the production of products in standardized sizes and qualities and in multiple quantities."  830 Code Mass. Regs. § 58.2.1(6)(b)(5).

Similarly, Skechers would have us ignore its activities after the creation of prototypes. Thus, it argues that the board erred in considering its fitting process, in which Skechers product technicians interact with the third-party factories to ensure Skechers's requirements are met, "because the fitting process is not a sine qua non of the salability of the manufactured shoes." Again, there is no basis in the law or the facts to view a taxpayer's activities piecemeal. Although any one particular function that Skechers performs may not be necessary and integral to the production of its shoes, without Skechers employees' involvement in the manufacturing process from beginning to end, the output would be inconsistent with the Skechers brand and its standards.

Skechers devotes a substantial portion of its brief, as it did in proceedings before the commissioner and the board, attempting to distinguish a board decision finding a different shoe company, Deckers, to be engaged in manufacturing. See Deckers Outdoors Corp. vs. Commissioner of Revenue, Appellate Tax Bd., Nos. C320020, C321955, ATB 2018-227 (June 21, 2018) (Deckers). Skechers argues essentially that it exercised less extensive control over its overseas third-party factories than Deckers did. We need not engage in a comparison between Skechers and Deckers, however, because nothing in the board's Deckers decision suggests that Deckers's participation in the

manufacturing process provided the benchmark for the minimum involvement against which other taxpayers are to be judged. Indeed, the statute instructs, "In determining whether a process constitutes manufacturing, the commissioner will examine the facts and circumstances of each case."  G. L. c. 63, § 38 (l) (1).  As to Skechers's argument that it was not engaged in manufacturing because its overseas employees conducted only "quality assurance," whereas Deckers's overseas employees conducted "quality control," we agree with the board that the labels are inconsequential because "the record showed that quality inspection -- regardless of its label -- was conducted by Skechers'[s] employees throughout the shoe-creation process, on-site in the factories," with Skechers quality assurance personnel present on a daily basis.[3]

Viewing its operations "as a whole," Noreast Fresh, Inc., 50 Mass. App. Ct. at 357, it is plain that Skechers was engaged in manufacturing as it is expansively defined by Massachusetts

---

[3] We further note that in each of its annual 10-K reports filed with the Securities and Exchange Commission for the relevant tax years, Skechers touted its "quality control program" (emphasis added), which was "designed to ensure that not only finished goods meet our established design specifications, but also that all goods bearing our trademarks meet our standards for quality."  These reports also referred to the "array of inspection procedures at various stages of the production process" performed by Skechers "quality control personnel located in China and Vietnam."

law.  The board's decision was supported by substantial evidence and correctly applied the law.

    c.  Manufacturing "in substantial part."  Conceding that its manufacturing activities would be considered "substantial" under at least one of the four quantitative, percentage-based tests set forth in G. L. c. 63, § 38 (l) (1), Skechers argues that "there is also a subjective -- or qualitative -- component to the analysis under the statute."  Skechers contends that its manufacturing activities are "merely trivial or only incidental to its principal business," and, therefore, not substantial. Fernandes Super Mkts., Inc., 371 Mass. at 322, quoting Commissioner of Corps. & Taxation v. Assessors of Boston, 324 Mass. 32, 39 (1949).

    This contention is unavailing for at least three reasons. First, Skechers did not raise this argument before the board, relying instead on its position that it did not engage in manufacturing at all.  The argument is therefore waived.  See G. L. c. 58A, § 13 ("The court shall not consider any issue of law which does not appear to have been raised in the proceedings before the board").  Second, and in any event, a taxpayer's manufacturing activities are substantial, by definition, if they meet any one of the four quantitative tests.  See G. L. c. 63, § 38 (l) (1).  To the extent being considered a manufacturing corporation is beneficial for a taxpayer -- for example, to

qualify for certain tax exemptions -- it is open to the taxpayer to argue that even if it does not satisfy any of the four quantitative tests, manufacturing nonetheless makes up a substantial component of its activities.  See 830 Code Mass. Regs. § 58.2.1(6)(d) ("A corporation whose activities satisfy none of the four tests for substantiality may nevertheless qualify for manufacturing corporation classification by establishing, through other relevant criteria, that its manufacturing activities are substantial . . .").  But nothing in the statute or regulations suggests that satisfying any of the other four tests for substantiality is not dispositive.  Third, Skechers's argument fails on the facts.  Its manufacturing activities are neither trivial nor incidental.  Skechers's principal business is to design, market, and oversee the production of footwear according to its quality standards and specifications.  Although Skechers denies it, the fact that Skechers engages in manufacturing in substantial part is, objectively, undeniable.

Conclusion.  The decision of the Appellate Tax Board is affirmed.

So ordered.